IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SOUTHERN PARTS &
ENGINEERING COMPANY, LLC, a
Delaware limited liability company,

   Plaintiff,

    v.

AIR COMPRESSOR SERVICES,
LLC, a South Carolina limited liability
company, et al.,

   Defendants.

CIVIL ACTION FILE
NO. 1:13-CV-2231-TWT

**OPINION AND ORDER**

     This is a theft of trade secrets action. It concerns a competing business started by two former employees of the Plaintiff Southern Parts & Engineering Company, LLC. It is before the Court on the Defendants' Motion to Dismiss Counts II, III, and IV of the Plaintiff's First Amended Complaint. For the following reasons, the Motion to Dismiss [Doc. 20] is DENIED.

**I. Background**

     The Plaintiff Southern Parts & Engineering Company, LLC ("Southern Parts") is in the business of selling and servicing air compressors. (Am. Compl. ¶ 1.) In August of 2011, Leslie Shade and Millard Williamson began working for the Plaintiff.

(Am. Compl. ¶¶ 17-18.) Williamson was a sales associate and Shade was the Director of E-Commerce. (Am. Compl. ¶¶ 17-18.) In addition to maintaining the Plaintiff's website, Shade was responsible for developing the Plaintiff's internet-based sales division for air compressor lubricants. (Am. Compl. ¶ 16.) This division was called the Industrial Lubricant Store. (Am. Compl. ¶ 16.) Shade was also sent on business trips to South Carolina to inspect properties that could potentially be used for the Industrial Lubricant Store. (Am. Compl. ¶¶ 20-21).

On November 9, 2012, Shade and Williamson both resigned from their positions with the Plaintiff. (Am. Compl. ¶ 12.) Then on November 29, 2012, they registered a limited liability company called Air Compressor Services ("Air Compressor Services") with the South Carolina Secretary of State's office. (Am. Compl. ¶ 22.) Air Compressor Services – which also specializes in the sale of air compressor parts and lubricants – uses several of the South Carolina properties that Shade had previously inspected for the Plaintiff. (Am. Compl. ¶ 24.)

The Plaintiff came across the website that had been set up for Air Compressor Services, which allegedly bears many similarities to the website that Shade was supposed to create for the Industrial Lubricant Store. (Am. Compl. ¶¶ 24, 26.) The Plaintiff then hired forensic computer experts to investigate the computer activity of Shade and Williamson in the weeks leading up to their resignations. (Am. Compl. ¶

27.) This investigation revealed that Shade and Williamson had (1) accessed the Plaintiff's databases which contain customer information, financials, and business plans, (2) copied confidential information, including trade secrets, onto USB drives, (3) used the Plaintiff's computers to conduct preliminary research for Air Compressor Services and its website, and (4) used the Plaintiff's resources to contact a marketing firm for services relating to Air Compressor Services. (Am. Compl. ¶¶ 28-29.) Even more, the investigation revealed that Shade and Williamson had remotely accessed the Plaintiff's private network even after they had resigned in order to further collect confidential information. (Am. Compl. ¶¶ 28-29.) Shade and Williamson have allegedly used the appropriated information – e.g., the Plaintiff's trade secrets and website – to benefit Air Compressor Services. (Am. Compl. ¶ 30.)

The Plaintiff asserted claims against Air Compressor Services and Shade for (1) misappropriation of trade secrets, (2) intentional interference with contractual and business relations, and (3) violation of the Computer Fraud and Abuse Act ("CFAA"). The Defendants only move to dismiss the claims for intentional interference with contractual and business relations and violation of the CFAA.

## II. Legal Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. Ashcroft v. Iqbal, 129 S.Ct.

1937, 1949 (2009); FED. R. CIV. P. 12(b)(6). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts; even if the possibility of recovery is extremely "remote and unlikely." Bell Atlantic v. Twombly, 550 U.S. 544, 556 (2007). In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff. See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir. 1983); see also Sanjuan v. American Bd. of Psychiatry and Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) (noting that at the pleading stage, the plaintiff "receives the benefit of imagination"). Generally, notice pleading is all that is required for a valid complaint. See Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied, 474 U.S. 1082 (1986). Under notice pleading, the plaintiff need only give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests. See Erickson v. Pardus, 551 U.S. 89, 93 (2007) (citing Twombly, 127 S.Ct. at 1964).

### III. Discussion

**A. Intentional Interference with Contractual and Business Relations**

The Plaintiff claims that the Defendants impermissibly used and converted the Plaintiff's resources to develop Air Compressor Services. The Plaintiff further argues

that this made Air Compressor Services a competitive alternative to the Plaintiff, thus interfering with the Plaintiff's contractual and business relationships. "Tortious interference claims, whether asserting interference with contractual relations, business relations, or potential business relations, share certain common essential elements: (1) improper action or wrongful conduct by the defendant without privilege; (2) the defendant acted purposely and with malice with the intent to injure; (3) the defendant induced a breach of contractual obligations or caused a party or third parties to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff."[1] Disaster Servs., Inc. v. ERC P'ship, 228 Ga. App. 739, 740 (1997).

The Defendants claim that the Plaintiff has not alleged any wrongful conduct that may support a tortious interference claim. In support, the Defendants first argue that there is nothing wrong with soliciting a former employer's customers. (Defs.' Mot. to Dismiss, at 8-9.) This is correct. See Tom's Amusement Co., Inc. v. Total Vending Servs., 243 Ga. App. 294, 298 (2000) ("[A]bsent a valid noncompete or

---

[1] To be clear, "[t]ortious interference with business relations is a distinct and separate tort from that of tortious interference with contractual relations, although some of the elements of the two torts are similar . . . [p]roof of a valid and enforceable contract is not required as an element of a cause of action for intentional tortious interference with business relations." Renden, Inc. v. Liberty Real Estate Ltd. P'ship III, 213 Ga. App. 333, 334 (1994).

nonsolicit covenant a former employee may go to customers whom he procured for the old employer and endeavor to persuade them to change their trade to his advantage."). Here, however, the Plaintiff is not basing its claim on the Defendants' customer solicitations. The wrongful conduct that forms the basis of the Plaintiff's claim is the misuse and conversion of its resources.[2]

The Defendants then argue that their use and conversion of the Plaintiff's resources were not wrongful because Shade was allowed to prepare the launch of Air Compressor Services while still employed with the Plaintiff. (Defs.' Mot. to Dismiss, at 13-14.) It is true that "an employee breaches no fiduciary duty to the employer simply by making plans to enter a competing business while he is still employed." E.D. Lacey Mills, Inc. v. Keith, 183 Ga. App. 357, 362 (1987). "Even before the termination of his agency, he is entitled to make arrangements to compete . . . [and] before the end of his employment, he can properly purchase a rival business and upon termination of employment immediately compete." Id. at 362-63 (internal quotation

---

[2] The Defendants misunderstand the Plaintiff's argument. The Plaintiff is not claiming – as the Defendants suggest – that the misuse and conversion of its resources were "wrongful" *only* insofar as they rendered the Defendants' customer solicitations to be "wrongful." The Plaintiff is arguing that the misuse and conversion of its resources were *independent* wrongful acts that ultimately induced third parties to breach a contract and/or fail to enter into or cease a business relationship with the Plaintiff. To the extent that the Plaintiff references the customer solicitation efforts, it is merely arguing that they were successful due to the Defendants' misuse of the Plaintiff's resources.

marks omitted). The difference here, of course, is that Shade did not simply make plans for Air Compressor Services while working for the Plaintiff. He allegedly used the Plaintiff's resources for the benefit of Air Compressor Services, and to the detriment of the Plaintiff. Assuming the Plaintiff's allegations to be true, Shade breached his duty of loyalty to the Plaintiff. See Crippen v. Outback Steakhouse Int'l, L.P., 321 Ga. App. 167, 171 (2013) ("[A]n agent breaches a duty of loyalty owed to his employer by using his position for his own personal benefit to the detriment of his employer."); DeKalb Collision Ctr., Inc. v. Foster, 254 Ga. App. 477, 481 (2002) ("Under Georgia law, 'an employee owes a duty of loyalty, faithful service and regard for an employer's interest.'"). Consequently, his conduct may form the basis of a tortious interference claim. See DeLong Equip. Co. v. Washington Mills Abrasive Co., 887 F.2d 1499, 1518-19 (11th Cir. 1989) ("The privilege defense is not available where interference is achieved through actions taken in violation of a confidential relationship."). That is what distinguishes this case from the one cited by the Defendants, Gresham & Associates, Inc. v. Strianese, 265 Ga. App. 559 (2004). (Defs.' Reply in Supp. of the Mot. to Dismiss, at 6-9.) There, the court found that there was no wrongful act because the defendant had not used any improper means in establishing a competing business. See id. at 561-562 ("[N]or is there any evidence that Strianese profited at Gresham's expense or otherwise failed to fulfill his duties

as vice president during his employment with Gresham . . . a corporate employee owing fiduciary duties to the corporation is not a privileged competitor of the corporation.").

Finally, the Defendants argue that the alleged wrongful acts occurred before Air Compressor Services was launched and began competing with the Plaintiff. (Defs.' Mot. to Dismiss, at 12-13.) Consequently, the Defendants argue, these wrongful acts cannot support a tortious interference claim. (Id.) The Defendants conflate the different elements of the tortious interference test. If the Plaintiff shows that the Defendants engaged in wrongful conduct, then the "wrongful conduct" requirement is met.[3] The circumstances regarding the wrongful conduct – e.g., when it occurred and how it impacted the Plaintiff's contractual or business relationships – may be relevant to other elements such as scienter, see Hayes v. Irwin, 541 F. Supp. 397, 429 (N.D. Ga. 1982) ("The act is malicious when it is done with knowledge of the plaintiff's rights and *with the intent to interfere with them.*"), and causation, see Camp Creek Hospitality Inns, Inc. v. Sheraton Franchise Corp., 139 F.3d 1396, 1409 (11th Cir. 1998) ("Georgia law requires a plaintiff to offer evidence that the defendant acted

---

[3] The Defendants cite to no Georgia caselaw qualifying the manner and time in which the "wrongful conduct" must occur in order to satisfy the first prong of the tortious interference test. Georgia courts appear to construe this element broadly. See, e.g., Disaster Servs., 228 Ga. App. at 741 ("Improper actions constitute conduct wrongful in itself.").

improperly and that *those acts* induced a breach of contract or prompted a third party to discontinue or fail to enter an anticipated business relationship.").[4] Because the Defendants made no argument regarding scienter and causation, the Court need not consider them at this stage. The Defendants' Motion to Dismiss the Plaintiff's claims for intentional interference of contractual and business relations should be denied. The Defendants also argue that the Plaintiff's tortious interference claims are superseded by the Georgia Trade Secrets Act. "Section 10-1-767(a) provides that the GTSA 'supersede[s] conflicting . . . laws of [Georgia] providing civil remedies for misappropriation of a trade secret.'" Penalty Kick Management Ltd. v. Coca Cola Co., 318 F.3d 1284, 1296 (11th Cir. 2003). "Subpart (b) . . . goes on to state, however, that the statute does not affect . . . [other civil remedies that are not based upon misappropriation of a trade secret.'" Id. Generally, "where the 'full extent' of the plaintiff's tort claims rely on the same allegations as those underlying the plaintiff's claim for misappropriation of a trade secret . . . the claims are 'conflicting' and thus precluded." Diamond Power Intern., Inc. v. Davidson, 540 F. Supp. 2d 1322, 1344-45 (N.D. Ga. 2007); see also Penalty Kick, 318 F.3d at 1297 n.11 (A claim is "preempted

---

[4] For example, a party may argue that a particular wrongful act was so far attenuated from the injury that one cannot infer that it was done with the intent to cause that injury. Likewise, a large temporal gap may also suggest that the wrongful act was not what truly induced a third party into breaking a contract or forgoing a business relationship with the plaintiff.

by the GTSA only to the extent [that] it involve[s] a trade secret."). Here, the Plaintiff is not relying on the alleged misappropriation of the Plaintiff's trade secrets. The Plaintiff's tortious interference claims are based on the Defendants' use and conversion of the Plaintiff's resources, such as the Plaintiff's computers and website.

### B. The Computer Fraud and Abuse Act

The Plaintiff claims that the Defendants accessed the Plaintiff's computers and computer networks without authorization, or exceeded the authorization they may have had, in violation of the CFAA. The CFAA created a private right of action for "[a]ny person who suffers damage or loss by reason of a violation of" section 1030. 18 U.S.C. § 1030(g). A violation may exist if a party "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . (C) information from any protected computer." 18 U.S.C. § 1030(a)(2). Moreover, a civil action may be brought "if the conduct involves 1 of the factors set forth in" subsection (c)(4)(A)(i)(I)-(V). 18 U.S.C. § 1030(g). One such factor is that the offense has caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C. § 1030(c)(4)(A)(i)(I).

The Plaintiff alleged that it had to hire computer forensic experts to determine the nature of the Defendants' unauthorized access, and that this alone cost at least $5,000. (Am. Compl. ¶ 66; Pl.'s Resp. to Defs.' Mot. to Dismiss, at 13.) In response,

the Defendants argue that in order to be a "loss," as the term is used in the CFAA, the costs must be a consequence of an "interruption in service." (Defs.' Reply in Supp. of the Mot. to Dismiss, at 12-13.) The Defendants thus argue that because the Plaintiff alleged no interruption in service, it has failed to allege a "loss" aggregating to at least $5,000 in value. (Id.)

The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, *and* any revenue lost, cost incurred, or other consequential damages incurred *because of interruption of service*." 18 U.S.C. § 1030(e)(11) (emphasis added). One possible reading would be that the "interruption of service" language only applies to the second half of the definition, "any revenue lost, cost incurred, or other consequential damages incurred." 18 U.S.C. § 1030(e)(11). Conversely, under the Defendants' suggested reading, the "interruption of service" language applies to *all* of the listed items. There is a split among District Courts regarding this question. See Continental Group, Inc. v. KW Property Management, LLC, 622 F. Supp. 2d 1357, 1371 (2009). The Court

concludes that the "interruption of service" limitation only applies to "any revenue lost, cost incurred, or other consequential damages incurred."[5]

First, "[t]o the extent possible, the rules of statutory construction require courts to give meaning to every word and clause in a Statute." Brotherhood of Locomotive Engineers & Trainmen Gen. Comm. of Adjustment CSX Transp. N. Lines v. CSX Transp., Inc., 522 F.3d 1190, 1195 (11th Cir. 2008). "[C]ourts must reject statutory interpretations that would render portions of a statute surplusage." Id. The Defendants' reading would make the first half of the definition surplusage. The first half lists specific costs: "the cost of responding to an offense, conducting a damage assessment, . . .." 18 U.S.C. § 1030(e)(11). The second half of the definition broadly states that "loss" includes "*any* . . . cost incurred . . . because of interruption of service." Id. (emphasis added). If the "interruption of service" language applied to the first half of the definition as well, then it would be entirely subsumed by the broader

---

[5] Multiple District Courts have reached the same conclusion. See, e.g., Trademotion, LLC v. Marketcliq, Inc., 857 F. Supp. 2d 1285, 1293 (M.D. Fla. 2012) ("[T]he Court finds 'loss' as used in the provision does not relate solely to losses incurred due to an interruption of service."); Quantlab Technologies Ltd. (BVI) v. Godlevsky, 719 F. Supp. 2d 766, 776 (S.D. Tex. 2010) ("[T]he term 'loss' encompasses . . . two types of harm: costs to investigate and respond to a computer intrusion, and costs associated with a service interruption."); Bashaw v. Johnson, 11-2693-JWL, 2012 WL 1623483, at *3 (D. Kan. May 9, 2012) ("The majority of courts have construed the term 'loss' to include only two types of injury-costs incurred (such as lost revenues) because the computer's service was interrupted and costs to investigate and respond to computer intrusion or damage.").

wording of the second half. By contrast, the Plaintiff's reading would give effect to both halves. The latter half refers to general costs incurred because of interruptions in service, and the former refers to certain specific costs that are not necessarily based upon interruptions in service.

Second, the Court "may turn to legislative history as an interpretive aid," but it must "do so with due regard for its well-known limitations and dangers." Garcia v. Vanguard Car Rental USA, Inc., 540 F.3d 1242, 1247 (11th Cir. 2008). The Eastern District of Michigan explained:

> The legislative history . . . suggests that Plaintiff has the better argument. As initially proposed, the bill that later became law provided:
> "the term 'loss' includes-
> (A) the reasonable costs to any victim of-
>     (i) responding to the offense;
>     (ii) conducting a damage assessment; and
>     (iii) restoring the system and data to their condition prior to the offense; and
> (B) any lost revenue or costs incurred by the victim as a result of interruption of service." Enhancement of Privacy and Public Safety in Cyberspace Act, S. 3083, 106th Cong. (2000) . . . Although this internal structure was omitted from the definition enacted the following year, it strongly suggests that the drafters did intend that "loss" embrace two types of injury.

Dice Corp. v. Bold Technologies, No. 11-13578, 2012 WL 263031, at *2 (E.D. Mich. Jan. 30, 2012). The modification to the bill as initially proposed was largely stylistic. This does not suggest a congressional intention to now subjugate the *entire* list to the "interruption of service" qualifier. See id. at *6 ("[N]othing suggests that this

modification was intended to be substantive . . . although minor stylistic changes were made, in substance . . . [the] bill was adopted in full."). As the Plaintiff has an alleged loss amounting to at least $5,000, the Defendants' Motion to Dismiss the Plaintiff's CFAA claim should be denied.

## IV. Conclusion

For these reasons, the Court DENIES the Defendants' Motion to Dismiss [Doc. 20].

SO ORDERED, this 19 day of February, 2014.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge